# David M. McFarland, Plff. in Err., *v.* David McClees, Admr.

A money lender who receives a sum of money to loan is bound to exercise reasonable care and prudence in making the loan and taking proper security; if through his negligence or carelessness, the money is lost, he becomes liable to make good the loss.

(Decided February 23, 1886.)

Error to the Common Pleas of Chester County to review a judgment for plaintiff in an action on the case.    Affirmed.

NOTE.—Where a real-estate broker and conveyancer employed to invest money is remiss in his duty in examining the records, and fails thereby to discover facts which would have shown that the mortgage was fraudulent, he may be held responsible for negligence.   Taylor v. Hammell, 201 Pa. 546, 51 Atl. 316.

The facts of the case appear in the charge to the jury given in the court below, which was as follows:

Charge by FUTHEY, J.:

This is an action brought by the administrator of Joseph McClees, against David McFarland. The defendant is a banker and money lender, residing in West Chester, and a part of his business is to receive moneys from persons and loan the same for them on securities agreed upon.

On April 30, 1879, Joseph McClees placed in the hands of Mr. McFarland $600 to loan on bond and mortgage. This money was loaned to Edwin J. Scott, and for his use, and a judgment given by John R. Scott, his father, and himself. The real estate which was owned by John R. Scott at the time, Edwin J. Scott not being the owner of real estate, consisted of about 100 acres, situated on the Brandywine creek, known as the Island farm, and another tract of 39½ or 39¾ acres, called the quarry tract.

In the fall of 1880, about a year and a half after the loaning of the money by Mr. McFarland to the Scotts, this real estate was sold at sheriff's sale, and did not realize enough to pay the prior liens which were upon it, falling short about $600 of reaching this lien.

Since the loan was made, Joseph McClees has died; and David McClees, his administrator, brings this suit against Mr. McFarland to recover the $600 with its unpaid interest.

The first question presented to you has reference to the duty of a money lender. I say to you that the law implies a promise, on the part of the money lender, that he will exercise competent skill and proper care in the service which he has undertaken, to wit, the making of the loan and taking proper security. If he does not exercise such skill and care, and loss ensues by reason thereof, he is liable for the loss. He is liable for carelessness or negligence in the performance of the duty intrusted to him.

In actions for such negligence, the burden of proof is upon the party alleging negligence. The law will not presume that there was a want of proper care, without proof being presented to that effect. If money is loaned and loss ensues without more appearing, then there would be no liability; because the law presumes, in the first instance, that there was such skill and care exercised. If it be shown, however, that there was a want

of proper skill and care in making the loan, and loss results therefrom, the money lender is responsible.

The question then arises: Was there a want of the exercise of proper carefulness in making this loan? The loan was to be on real estate. That is implied from the character of the receipt or certificate, which provides that the money shall be loaned on bond and mortgage. It was not to be a loan on personal property or on personal credit, but on real estate, so that the loan should be as secure as it could be made by the exercise of reasonable skill and care, which the defendant by his business as a money lender held himself out to perform.

Now, although the certificate provides that a mortgage should be taken, yet if, instead thereof, a judgment was taken, and the loss resulting was not due to the fact that a judgment was taken rather than a bond and mortgage, it would be immaterial. If a mortgage had been taken under the same circumstances and entered just as the judgment which was taken was entered, the loss would have been the same; because the judgment was a lien from April 30, 1879, just as the mortgage would have been a lien. The loss, therefore, did not occur in consequence of not following literally the language of the certificate. Had the loss resulted from taking a judgment, rather than a bond and mortgage, the defendant would have been liable for not following instructions; but as it clearly appears that the loss did not occur in consequence of taking a judgment rather than a bond and mortgage, this of itself would not make the defendant responsible. No liability, therefore, under the circumstances of this case, arises by reason of the substitution of a judgment for a mortgage, for clearly the loss did not result from the substitution.

We come, then, to the real question in the case:—Whether this loan was made with proper care; such care as should have been exercised by the defendant. It appears that Mr. McFarland examined the title of the Scott real estate, had a brief of it made, and also searched for liens and made a list of them. Thus far, it would appear that the defendant performed his duty.

Next, he made some inquiry in relation to the value of the real estate. Mr. Shields says that Mr. McFarland inquired of him in reference to the value of this property, and that his opinion, as given to Mr. McFarland, was that the 100-acre tract would bring $120 per acre at any time, and that the quarry lot

would bring $125 or $130 per acre. The values thus given amount to $17,200. Mr. March testifies that McFarland inquired of him with reference to the value of the quarry lot and that he said it was worth $4,500; that it had sold for $5,000, and had sold for $6,000, and was always worth $4,500. Mr. March, I believe, did not then give Mr. McFarland the value of the 100-acre farm; but it appears that one year later, when real estate was of about the same value, Mr. March valued the farm at $120 per acre, and the quarry lot at $125 an acre; substantially the same figures Mr. Shields gave. If these witnesses are believed, Mr. McFarland was informed that the real estate held by John R. Scott was worth about $17,000.

There is some evidence given by the plaintiff as to the value of this land. John Leslie says that he bought the 100-acre farm at the sheriff's sale for $9,620, nearly $100 an acre; and that in 1879, when this loan was made, it was worth about $100 per acre; and that the quarry lot was worth about $100 an acre, or about $4,000, making the real estate worth about $14,000. He says that in 1860 he gave $5,000 for the quarry lot and sold it to his brother for $5,500, and that his brother sold it for $6,000. It appears that Mr. March purchased it for something over $4,000. Mr. Ingram testified that he thought this property sold at sheriff's sale at $9,620, about its full value, and that the quarry lot was worth $4,500. The quarry lot was sold at sheriff's sale for a nominal figure, $1, subject to a mortgage of $4,500. Mr. Chambers testified that the 100-acre farm was worth from $120 to $125 an acre, and the quarry lot about $125 an acre, which is substantially the information Mr. Shields gave to Mr. McFarland; the whole amounting to $17,000.

What, now, were the liens upon that property? Upon the quarry there was a mortgage of $4,500. There was a judgment, which covered both tracts, to Catharine Templeton, for $2,000; a judgment of Clinton Scott for $3,800, a judgment to Nelson Scott for $2,000, and to John Leslie for $1,800, making, in principal, altogether, $14,100. In addition to this, there was a lien on the 100-acre farm in favor of Mr. Scott's mother of an annuity of $300, during the life of Mrs. Scott. At the time of making the loan in question, Mrs. Scott was about seventy-four years of age. It will be necessary for you, therefore, to ascertain the amount of this lien, to do which you will have to take into consideration Mrs. Scott's prospect of life. Proverbially,

life is uncertain, and the $300 annuity might at any time expire by the death of Mrs. Scott. If she lived for five years, for instance, $1,500 would represent this amount of the lien. I do not indicate any number of years Mrs. Scott was likely to live, but simply call your attention to the fact that it is the duty of the prudent money lender to make an estimate of what this lien would probably amount to in the number of years Mrs. Scott might reasonably be expected to live. Whatever that amount would be, ought to be added to the liens to which I have called your attention, $14,100.

Then, too, there is the risk of accumulation of interest to be guarded against by the money lender; for should the interest of those liens spoken of accumulate, that accumulation of interest would also have to be paid prior to this lien of $600, in case the property should be sold.

This loan of $600 was made on the back of all these liens. Was it prudent for Mr. McFarland to make this loan of $600 upon property whose value he ascertained was $17,000, subject to liens of $14,100 and the annuity referred to? The costs of sale, in case the property should be sold, must be also taken into consideration. Was there such a margin as a reasonable money lender should take? Take the $17,000, put it on one side; then upon the other side put the $14,100, and the amount of the annuity for what period you find Mrs. Scott's prospect of life, add reasonable costs of sale, and provide for reasonable accumulations of interest. Is there, between the two, a margin which would justify a prudent money lender in adding $600 to it? Or, if there was a margin, was it so small that it was a risk which should not have been taken? As I have before said, in making loans upon real estate, as investments, it is the duty of the money lender to exercise proper care; not to loan it so closely that there may be danger at any moment that the real estate, by any fall in the market or any circumstances which may reasonably arise would not be sufficient to pay the loan. It is his duty to see that there be such margin on the real estate as would make it reasonably safe, and such as a prudent, careful man, exercising reasonable care, would regard in making loans. Contingencies, such as a fall in the value of the land, must be provided against. Real estate, as we know, has no fixed value, but fluctuates up and down; and against these fluctuations provisions

should be made; not the unforeseen depressions, but such as are practically met with every day.

We must entirely throw out of view the fact that Mr. Scott, on whose property this loan was a lien, possessed a large amount of personal property. This, as well as the supposed skill of the Messrs. Scott as business men, may have been relied on by Mr. McFarland. But this loan was not to be made on the faith of personal property. A man, if he sees fit, may lend money on personal property; but, as we know, personal property sometimes takes wings and flies away; eludes the grasp of the money lender, as it did in this case, in which the business skill of the Scotts does not seem to have prevented failure.

The money in question, however, as I said before, was to be loaned on real estate, on bond and mortgage. The personal property and the business capacity of the borrower were not the things to be relied upon. Mr. McFarland may have relied upon the business capacity, and upon the fact that there was considerable personal property. But I say to you that, in judging of this matter, you will disregard the value of the personal property as an element of safety in this loan, as also the supposed business capacity of the borrowers; and you will ascertain whether it was such a loan on real estate as was required, by proper care. Taking the value of the land as you may find Mr. McFarland to have practically had it, and ascertaining the liens, was there such a margin as would justify the making of this loan of $600 ? If there was not, then there was not the exercise of such care as the law requires, and the defendant would be responsible. If there was the exercise of proper care, if it was such a loan as a prudent money lender in the exercise of the business which he professed to perform, would have made, the defendant would not be responsible.

No one will dispute Mr. McFarland's skill and ability in performance of duties of this kind; and the question here is not whether he had the ability to perform the making of this loan, but whether he exercised proper care in this instance, or whether he placed undue reliance upon the personal property and the supposed business capacity of the Scotts. Your determination of this question will determine your verdict.

Another question has been raised in this case. It is alleged upon the part of the plaintiffs that Mr. McFarland was the agent of Mr. McClees and should have given him notice that a sheriff's

sale was about to take place. I do not see any evidence of agency to submit to the jury. Mr. McFarland was to make this loan for Mr. McClees, and was to be paid for it. The remuneration, however, did not come from Mr. McClees, but, according to custom, from the borrower. It is immaterial, however, which party paid for the making of the loan. The interest, it seems, was paid to Mr. McFarland and paid out by him to Mr. McClees. The bond was left there, it is said, just as many others were left, because Mr. McFarland had a fire-proof safe, In such cases the papers belong to the people who leave them, and this would not make Mr. McFarland intrusted with the care of this loan, beyond the making of it.

Again; if Mr. McFarland had been an agent, the presumption would arise that he had performed his duty in giving notice of the sheriff's sale; but there is no direct evidence on the subject as to whether Mr. McClees knew of it or not, and, because Mr. McClees is dead, Mr. McFarland cannot speak of any transactions that occurred before Mr. McClees' death. If there was any such agency, the presumption would be that he did his duty and gave him notice.

The plaintiff points to the payment of interest as showing of such agency. It appears that when Mr. McClees called at the office of Mr. McFarland for the first year's interest, it had not yet been paid by Mr. Scott, and Mr. McFarland advanced it, and that Mr. Scott later in the same day came in and paid it. The interest after that, for two years, appears to have been advanced by Mr. McFarland. This, however, was after the sheriff's sale; after the lien was gone; and I do not consider the payment of this interest afterwards as sufficient to raise such an agency on the part of Mr. McFarland as would visit him with the consequences of an agency. I say to you that if there was such an agency, the law would presume that proper notice was given.

I do not conceive, however, that the case turns upon this question of agency or want of agency, or notice or want of notice; but that it turns upon the question which I have submitted to you, as to whether this loan was such a loan, as a man, holding himself out as practised in that business, should have made; whether the loan was based on a reasonable amount of real estate, as, in the mind of Mr. McFarland at the time, allowed such a margin as a reasonable money lender should have

required, or whether the amount of the liens was such that it was unsafe to lend $600 on the back of them. That is the real question in the case. As I said, the personal property is to be thrown out of consideration, because the loan was to be made on real estate, and not upon the faith of personal property or the personal credit of the borrower.

Judgment having been entered upon a verdict for plaintiff, defendant brought error.

*Wm. B. Waddell* and *Joseph Hemphill,* for plaintiff in error. —The law implies a promise from brokers, bankers, and other agents that they will severally exercise competent skill and proper care in the service they undertake to perform, but it neither implies nor requires more than this. Gheen v. Johnson, 90 Pa. 47; Wingate v. Mechanics' Bank, 10 Pa. 108; Watson v. Muirhead, 57 Pa. 167, 98 Am. Dec. 213.

But in actions for negligence the burden of proof is upon the plaintiff. The law will not presume it for him. McCully v. Clarke, 40 Pa. 407, 80 Am. Dec. 584.

And his conduct is not necessarily to be judged by the result. Watson v. Muirhead, 57 Pa. 166, 98 Am. Dec. 213.

*Wm. M. Hayes* for defendant in error.

Per Curiam.

The business of the plaintiff in error was that of a lender of money. As such he took the money in question for the expressed purpose of lending it for the benefit of the defendant in error, on bond and mortgage. It thereupon became his duty to exercise reasonable care and prudence. He held himself out as possessing competent skill to determine what reasonable care and prudence required on his part. If he failed to exercise them, and through his negligent and careless conduct the money was lost, he became liable to make it good. This is substantially the case as it was submitted to the jury. They have found that due care was not properly exercised, and that he was guilty of negligence.

Judgment affirmed.